IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **BRAHMAN RESOURCE** | § | **Case No. 20-33697** |
| **PARTNERS, LLC,** *et al.,* | § | |
| | § | **Chapter 11** |
| Debtors.[1] | § | |
| | § | **(Joint Administration Requested)** |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364
AND 507, AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING USE
OF CASH COLLATERAL; (II) AUTHORIZING THE DEBTORS TO OBTAIN
SECURED POST-PETITION FINANCING; (III) GRANTING LIENS AND
SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V)
SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON
THIS MATTER ON JULY 29, 2020 AT 11:00 A.M. IN COURTROOM 400, 4th FLOOR, UNITED
STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK
STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU
BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST
EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE
HEARING.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND
GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN JULY 29, 2020.**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

respectfully state the following in support of this emergency motion (the "**Motion**"):

## I.   RELIEF REQUESTED

1.      By this Motion, the Debtors request the entry of an interim order, substantially in

form attached hereto (the "**Interim Order**"), providing for, among other things:

> a.      Authorization for the Debtors to obtain senior secured, post-petition
> financing on a priming, super-priority basis from Brahman DIP Lender,

---

[1] The debtors and debtors in possession these chapter 11 cases, along with the last four digits of their respective
Employer Identification Numbers, are as follows: Brahman Resource Partners, LLC (7253); and BRP Vista Grande,
LLC (1481).  The Debtors' service address is: 8900 Eastloch Dr., Suite 235, Spring, Texas 77379.

LLC (the "**DIP Lender**") under the form of a Senior Secured Debtor-in-Possession Credit Agreement by and between the Debtor and the DIP Lender (as subsequently amended, restated, or otherwise modified from time to time, the "**DIP Financing Agreement**"), attached hereto as **Exhibit A**, in an aggregate principal amount not to exceed $1,500,000, and including, without limitation, principal, interest, fees, expenses, and other costs of the DIP Lender in these Chapter 11 Cases, in accordance with the terms and conditions set forth herein and in the DIP Financing Agreement, the other Loan Documents (as defined in the DIP Financing Agreement), and all other related agreements and documents (collectively, the "**DIP Financing**");

b.      authorizing the Debtor to enter into, execute, deliver and perform under the DIP Financing Agreement and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of the Debtors to the DIP Lender on account of the DIP Financing or granting or perfecting liens or security interests by the Debtor in favor of and for the benefit of the DIP Lender on account of the DIP Financing Agreement, as the same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all agreements and documents currently executed or to be executed in connection therewith or related thereto, between Debtor and the DIP Lender, the terms of which are referenced and incorporated herein as if fully set forth herein (collectively, the "**DIP Documents**");

c.      approving the terms and conditions of the DIP Financing, including the DIP Financing Agreement and the other DIP Documents;

d.      granting valid, enforceable, non-avoidable, and automatically fully perfected priming liens on, and security interests in, the applicable collateral (the "**DIP Collateral**") to the DIP Lender to secure all obligations (the "**DIP Obligations**") pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code;

e.      granting allowed superpriority administrative claims to the DIP Lender with respect to the DIP Obligations pursuant to section 364(c)(1) of the Bankruptcy Code;

f.      modifying the automatic stay of section 362 of the Bankruptcy Code to the extent set forth herein and in the DIP Documents, and providing for the immediate effectiveness of this Interim Order; and

g.      scheduling a final hearing (the "**Final Hearing**") to consider entry of an granting the relief requested in the Motion on a final basis (the "**Final Order**"), and authorizing the Borrower to borrow from the DIP Lender under the DIP Documents up to the full amount of the DIP Financing.

2.      The proposed DIP Lender is a special purpose entity created by Arcadius (SW) Energy Capital, LP ("**Arcadius**"). Arcadius is an insider of Debtor Brahman as defined in section 101(31) of the Bankruptcy Code.  Specifically, Arcadius is a member of Debtor Brahman holding 97.7% of the Class A Units, as defined in that certain Amended and Restated Limited Liability Company Agreement of Brahman Resource Partners, LLC dated as of February 21, 2018. Notwithstanding the insider status of Arcadius, the Debtors and Arcadius have each been represented by separate counsel during the course of negotiations for the DIP Financing.  Further, the Debtors will continue in their efforts to seek out post-petition financing on terms more favorable to the Debtors and their estates prior to the entry of the Final Order granting the relief requested in this Motion.

## II.   JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are Sections 105, 361, 362, 363, 364 and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended and modified, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002, 4001-1(b) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "**Complex Case Procedures**").

## III.   BACKGROUND

### A.      General Background

6.      On July 26, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").

7.      Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

8.      The Debtors are a development stage independent oil and gas company focused on leasing, exploring and developing acreage in the liquids rich Southern Shelf of the Delaware Basin and Val Verde Basin in Pecos County, and Terrell County, Texas. The Debtors focus their efforts on acquiring and developing high-potential exploration and production assets in the area, specifically targeting the Woodford and Barnett formations.  Currently, the Debtors' asset portfolio consists of approximately 470 acres of producing oil and gas mineral leases (out of 17,045 gross acres and 8,222 net leased acres) in the Northeast corner of Pecos County and the Northwest portion of Terrell County.

9.      Formed on or about June 17, 2016, Debtor Brahman Resource Partners, LLC ("**Brahman**") holds leases and working interests in two (2) producing wells, and one (1) well to be completed during these Chapter 11 Cases.   Brahman acquired the working interests in 2016 with the two wells already on production.

10.      In early 2019, the Debtors initiated a new program to confirm their technical analysis regarding the Middle Woodford liquids window. In order to commence further field

development, the Debtors required and sought out additional capital to drill and develop a new exploratory well (the "**King of the Hill Well**").

11. Debtor BRB Vista Grande, LLC ("**BRP Vista Grande**") was formed on or about July 10, 2019 to own and operate the King of the Hill Well, and hold the applicable leases assigned by Brahman. After obtaining the requisite financing from ETC Texas Pipeline, Ltd., spudding of the King of the Hill Well began in November 2019. Work remains ongoing, and the Debtors intend to complete the King of the Hill Well during these Chapter 11 Cases.

**B.** **Events Leading to Bankruptcy**

12. Currently, the Debtors derive the totality of their revenue from the sale of crude oil, natural gas, and natural gas liquids. As a result, the Debtors' revenues and ultimate profitability, the value of the reserves, their access to capital, and their growth as a company are subject to the prevailing prices of crude oil, natural gas, and natural gas liquids, which have seen a prolonged downturn. In light of the commodity prices, the Debtors have not been able to generate sufficient cash from operations to satisfy their prepetition indebtedness and various other obligations as they become due. These factors have significantly harmed the Debtors' financial position, and as a result, the Debtors have incurred losses from operations after substantial capital expenditures were made exploring and developing the Delaware and Val Verde play. Accordingly, the Debtors filed these Chapter 11 Cases and have postured themselves to pursue a sale of the substantially all of their assets pursuant to section 363 of the Bankruptcy Code.

13. Additional information about the Debtors' businesses and affairs, capital structure, prepetition indebtedness, and the events leading up to the Petition Date, can be found in the *Declaration of Clay Border, Chief Executive Officer of the Debtors, in Support of the Chapter 11*

*Petitions and First Day Pleadings* (the "**First Day Declaration**"), which is filed on the Court's docket and is incorporated herein by reference.

**C.**     **Description of Debt**

     *i.*     *The ETC Loan Documents*

14.     In connections with their negotiations with ETC regarding financing for the King of the Hill Well, ETC required Brahman to assign the applicable leasehold interest to the newly created special purpose entity, BRP Vista Grande, such that BRP Vista Grande would own the collateral and ETC's liens would not be junior in interest to preexisting liens, if any.  On or about August 2, 2019, Brahman executed that certain Omnibus Consent (the "**Assignment**") pursuant to which Brahman partially assigned the applicable leases to BRP Vista Grande.

15.     Thereafter, the Debtors and ETC entered into those certain agreements (the "**ETC Loan Documents**") consisting of: (i) Gas Gathering and Processing Agreement (the "**Gathering Agreement**") dated as of October 1, 2019; (ii) Financing Agreement (the "**Financing Agreement**") dated as of October 3, 2019; (ii) Secured Promissory Note (the "**Promissory Note**") dated as of October 3, 2019; (iv) Limited Parental Guaranty (the "**Guaranty**") dated as of October 3, 2019; and (v) Deed of Trust, Mortgage, and Security Agreement (the "**Deed of Trust**") dated as of October 3, 2019.

16.     Pursuant to the ETC Loan Documents, ETC loaned BRP Vista Grande the amount of six million dollars ($6,000,000.00) to drill and complete the King of the Hill Well, and Debtor Brahman guaranteed such loan.  The King of the Hill Well was intended to serve as the collateral under the ETC Loan Documents (the "**Prepetition Collateral**").

17.     Prior to the Petition Date, in preparation for filing these Chapter 11 Cases, the Debtors undertook an analysis of the liens asserted against them.  During such investigation, the

Debtors discovered that neither the Assignment nor the Deed of Trust were filed in the property records of Pecos County or Terrell County.  Because ETC failed to file the Deed of Trust, it did not perfect its liens on the Prepetition Collateral.  Moreover, because the Assignment was never filed, the Debtors do not believe the Assignment is effective as to any third-parties without notice of such Assignment, to the extent any equitable transfer even occurred.  Finally, the descriptions of leases and wells contained within the exhibits to the Deed of Trust and Assignment were discovered to be inaccurate, and as a result of this error, they failed to capture the ultimate location of the King of the Hill Well.

18.     In light of the foregoing, the Debtors believe that ETC may hold valid, but unperfected, liens in the Prepetition Collateral that are clearly avoidable under the provisions of the Bankruptcy Code and applicable law.

ii.     *The M&M Liens*

19.     After ETC funded the required amount under the ETC Loan Documents, the Debtors began developing the King of the Hill Well in November 2019.  As part of this process, the Debtors engaged in numerous strategic relationships with then-existing and new service providers.  However, due to market conditions and ongoing liquidity issues, the Debtors became unable to pay these providers in the ordinary course of business.  Numerous vendors have asserted and recorded mechanics and materialmens liens (the "**M&M Liens**") against Brahman and the Prepetition Collateral.  Several of these parties (the "**M&M Lienholders**") have also initiated litigation against Brahman to foreclose on their M&M Liens.

20.     Due to the failure to record both the Deed of Trust and the Assignment, the Debtors believe that the M&M Lienholders are the holders of the senior secured interests in the Prepetition

Collateral, and that the Assignment from Brahman to BRP Vista Grande was not effective as to such M&M Lienholders.

21.     In sum, the Debtors have incurred a substantial amount of debt in order to fund their E&P activities and sustain operations.  As of the Petition Date, the Debtors estimate that they were indebted to ETC and the M&M Lienholders in an aggregate amount of approximately $8.2 million, without considering penalties, interest or other fees.  However, the Debtors dispute certain of the M&M Liens asserted by M&M Lienholders and the amounts allegedly owed.

   *iii.*     *Trade Debt*

22.     In addition to the secured debt owed to ETC and the M&M Lienholders, the Debtors have substantial unsecured debt owed to numerous trade creditors, among other third-parties.  In the ordinary course, the Debtors maintained relationships with various service providers in relation to their oil and gas operations which are critical to maintaining current levels of production.  Due to the various liquidity issues described herein, the Debtors do not have sufficient cash flow to pay the trade payables, and incurred unsecured debt of approximately $4 million.

**D.     Necessity of Debtor in Possession Financing and Use of Cash Collateral**

23.     In order to continue operations and complete the King of the Hill Well that would substantially increase the value of the Debtors' bankruptcy estates, the Debtors will require an injection of new cash as working capital to pay operating expenses and payroll obligations, maintain their leases, and ensure a smooth transition into the Chapter 11 Cases.  The Debtors do not currently generate sufficient cash from operations to pay their obligations as they come due and address certain operational issues necessary to preserve the value of their businesses, such as

paying employees and maintaining vendor relationships.  Preserving estate value and maintaining employee and operational relationships is vital in these Chapter 11 Cases.

24.     As set forth herein and in the First Day Declaration, the Debtors have an immediate need to use cash right away, or at least within a few days of filing this Motion.  As a result, the DIP Lender has agreed to extend the DIP Financing to fund the needed cash through the debtor-in-possession loan to the Debtors on emergency basis.  Prior to the entry of the Interim Order, the Debtors expect to execute the binding commitment with the DIP Lender to provide the necessary post-petition DIP Financing pursuant to the terms and conditions set forth in the DIP Financing Agreement and other DIP Documents for the purposes and amounts in the DIP budget (the "**Budget**") which is attached hereto as **Exhibit B** and incorporated by reference herein.  The primary terms of the proposed DIP Financing are set forth below:

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| **Parties to the DIP Financing Agreement** Bankruptcy Rule 4001(c)(1)(B) | <u>Borrowers</u>:  Brahman Resource Partners, LLC and BRP Vista Grande, LLC <br> <u>Guarantors</u>:  None <br> <u>DIP Lender</u>: Brahman DIP Lender LLC |
| **Term** Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The maturity date with respect to the DIP Financing shall be the earlier of: <br> i.   October 24, 2020; <br> ii.  the Debtors' failure to meet a Milestone; <br> iii. the sale of all or a substantial part of the assets of the Debtors; or <br> iv.  the date that all Loans shall become due and payable in full under the DIP Financing Agreement or DIP Orders, whether by acceleration or otherwise. <br> *See* DIP Financing Agreement § 1.2. |
| **Loan Commitment** Bankruptcy Rule 4001(c)(1)(B) | Total aggregate commitment of $1.5 million pursuant to a superpriority and priming secured term loan. <br> On the Closing Date, DIP Lender agrees to make the Loan to the Debtor (so long as the conditions set forth in Section 3.1 of the DIP Financing Agreement have been satisfied or waived) in accordance with the Debtors' approved Budget(s). <br> *See* DIP Financing Agreement §§ 1.1, 2.1, 2.3. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Lender's obligation to make loans shall not become effective until the satisfaction or waiver of all conditions precedent, including, but not limited to:<br><br>• Lender shall have received sufficient copies of each Loan Document originally executed and delivered by Borrower in form and substance satisfactory to it in its sole discretion.<br><br>• Borrower shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Loan Documents, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Requisite Lender in their sole discretion. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.<br><br>• There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that has not already been disclosed to the Lender that, in the opinion of the Requisite Lender in their reasonable discretion, singly or in the aggregate, materially impairs any of the transactions contemplated by the Loan Documents.<br><br>• No information or materials are or should have been available to the Borrower as of the Closing Date that are materially inconsistent with the material previously provided to the Requisite Lender for its due diligence review. Lender and its counsel shall be satisfied with a due diligence review of each Borrower's material agreements, including, but not limited to, satisfactory review of operating agreements, marketing agreements, transportation agreements, processing agreements and other agreements governing or relating to the Borrower's Oil and Gas Properties. Lender and its counsel shall be satisfied with a due diligence review of the Borrower.<br><br>• Since the date of the filing of the Bankruptcy Case, no event, circumstance or change shall have occurred that has caused or could reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect.<br><br>• Lender shall have received a fully-executed Borrowing Notice.<br><br>• Lender shall have received, prior to the Closing Date, all documentation and other information requested by Lender no later than five (5) Business Days prior to the Closing Date, under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT ACT, including, in icular, a duly executed W-9 tax form (or such other applicable IRS tax form) of the Borrower.<br><br>• The representations and warranties of the Borrower set forth in this Agreement shall be true and correct on and as of the Closing Date (unless such representations and warranties are stated to relate to a specific earlier date, in |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| | which case such representations and warranties shall be true and correct as of such earlier date).<br><br>• At the time of and immediately after giving effect to the issuance of the Loans to be made on the Closing Date, no Default or Event of Default shall have occurred and be continuing.<br><br>• Lender shall have received each additional document, instrument, legal opinion or item reasonably requested by the Lender, including, without limitation, a copy of any debt instrument, security agreement or other material contract to which Borrower may be a party.<br><br>• The Bankruptcy Court shall have entered the Interim DIP Order granting the super-priority claim status and the liens contemplated hereby and authorizing the loans under the Loan Documents, which order (i) shall be in full force and effect and shall not have been, in whole or in part, vacated, reversed, stayed, or set aside and (ii) shall not have been modified or amended without the consent of Lender on the Closing Date. All motions relating to the entry of the Interim DIP Order and the Final DIP Order and seeking approval of the Loan Documents shall be in form and substance satisfactory to the Lender on the Closing Date.<br><br>Notwithstanding the foregoing, the obligations of the DIP Lender to make the Loan under the DIP Financing Agreement shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.6 of the DIP Financing Agreement) at or prior to 5:00 p.m. (prevailing Central Time) on July 29, 2020 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).<br><br>*See* DIP Financing Agreement §§ 3.1. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Interest Rate:  The DIP Financing shall bear interest at a rate equal to the sum of (i) LIBOR plus nine and one-half percent (9.5%) per annum (as such amount may be increased pursuant to Section 2.6(c)) paid in cash.<br><br>Interest Payment Dates: Interest on the DIP Financing shall be due and payable on each Interest Payment Date (as defined in the DIP Financing Agreement).<br><br>Default Rate: Default interest rate of an additional two percent (2.0%) per annum upon the occurrence and during the continuance of an Event of Default.<br><br>*See* DIP Financing Agreement § 2.5(a), (b), (c). |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the DIP Financing shall be used for working capital requirements, operating expenses, capital expenditures, and general corporate purposes of the Debtors during the Chapter 11 Cases. The proceeds of the DIP Financing may only be used in accordance with the Budget or as otherwise permitted under the DIP Financing Agreement or in the applicable Borrowing Notice.<br><br>No part of the proceeds of the DIP Financing will be used, whether directly or indirectly, (a) for any purpose that entails a violation of any Governmental Requirement of any Governmental Authority, including Regulations T, U and X of the Board of Governors of the Federal Reserve System, or (b) in connection with any modification, stay or amendment of the DIP Orders without prior written consent of the DIP Lender. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| | No portion or proceeds of the DIP Financing, the DIP Collateral, or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs, or expenses incurred in connection with: (a) objecting, contesting, or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under, the DIP Documents, or any security interests, liens, or claims granted under this Interim Order, or the DIP Documents; (b) asserting any Challenges, claims, actions, or causes of action against the DIP Lender, or any of its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors; (c) preventing, hindering, or otherwise delaying enforcement or realization on the DIP Collateral; or (d) seeking to amend or modify any of the rights granted to the DIP Lender under the Interim Order or the DIP Documents, including seeking to use DIP Collateral on a contested basis.<br><br>*See* Interim Order ¶ 21; DIP Financing Agreement §§ 2.4, 5.11. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>DIP Lender's Fees</u>:  Whether or not the transactions contemplated by the DIP Financing Agreement shall be consummated or the documents related hereto shall be executed, Debtors agrees to pay at maturity all actual, reasonable and documented, out-of-pocket costs, and expenses incurred in connection with (a) the preparation, execution, delivery, and administration of the DIP Documents; (b) all fees and disbursements of counsel to DIP Lender in connection with the negotiation, preparation, execution, review, and administration of the DIP Documents and all documents related to the foregoing and any consents, amendments, waivers, or other modifications thereto any other documents or matters; (c) creating and perfecting Liens for the benefit of the DIP Lender including filing and recording fees, search fees, expenses and disbursements of counsel to the DIP Lender; and (d) fees and disbursements of any auditors, accountants, consultants, engineers or appraisers.<br><br>In addition, the Debtors agree to pay the following, without limitation: (i) all actual, reasonable and documented, out-of-pocket costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, engineers, advisors and agents employed or retained by DIP Lender) in connection with administration by DIP Lender or the custody or preservation of any of the DIP Collateral; (ii) all other actual, reasonable and documented, out-of-pocket costs and expenses incurred by DIP Lender after the Closing Date in connection with (1) the review and administration of the DIP Documents and all documents related to the foregoing and the transactions contemplated thereby, (2) any consents, amendments, waivers or other modifications to the DIP Documents and all documents related to the foregoing and the transactions contemplated thereby, and (3) any other documents or matters requested by any Loan Party; (iii) all costs and expenses, including attorneys' fees and costs of settlement, incurred by DIP Lender in enforcing any Obligations under the other Loan Documents; and (iv) all costs and fees and related expenses in connection with the formation and maintenance of any Person, structure or account necessary or reasonably desirable to DIP Lender for tax planning purposes in connection with the Loans.<br><br>*See* Interim Order ¶ 8; DIP Financing Agreement §§ 2.6(d), 8.2. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Financing is subject to a written rolling 13-week Budget setting forth the projected cash receipts and cash disbursements in a form and substance acceptable to the DIP Lender. The initial Budget is attached to the Interim Order as **Exhibit 2**.<br><br>*See* Interim Order ¶ 11; DIP Financing Agreement §§ 1.1, 5.1, 5.11, 6.5 |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall deliver, among other things: (a) on or before 5:00 p.m. (prevailing Central Time) on the last Tuesday of each rolling four-week period (each such date, a "**Reporting Date**," and each such four-week period, a "**Budget Period**"), an updated rolling 13-week cash flow forecast to the DIP Lender; (b) on or before 5:00 p.m. (prevailing Central Time) of the first Wednesday following each Reporting Date (each such Wednesday, the "**Testing Date**"), the Debtor shall provide the DIP Lender with a report of receipts and disbursements and a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the immediately preceding Budget Period; (c) on or before 5:00 p.m. (prevailing Central Time) on Wednesday of each calendar week, the Debtors shall provide the DIP Lender a weekly report of receipts and disbursements and a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the prior week; (d) as soon as available, and in any event within twenty (20) days after the end of each calendar month, the Debtors shall provide consolidated income statements, balance sheets, and cash flow statements; (e) promptly upon receipt thereof, the Debtors shall provide the DIP Lender a copy of all drilling and recompletion reports; and (f) together with deliver of financial statements of the Debtors, the Debtors must provide a summary of the accounts receivable and accounts payable aging reports as of the end of such period.<br><br>*See* Interim Order ¶ 11; DIP Financing Agreement § 5.1. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B) | On or before each Testing Date, the Debtors shall provide the DIP Lender with a report of receipts and disbursements and a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the immediately preceding Budget Period, which report and reconciliation shall be presented in the same form as the Budget (*i.e.*, with directly corresponding line items and variances for each on a line item by line item basis) and otherwise in form and detail reasonably satisfactory to the DIP Lender. The Debtors shall provide, and make its representatives and advisors available to representatives and advisors of the DIP Lender, to discuss qualitative explanations with respect to the foregoing.<br><br>As of any Testing Date, for the immediately preceding Budget Period, the Debtors shall not allow the actual (i) CapEx, (ii) Operating Cash Disbursements, and (iii) Estate Professionals' Allowed Fees to exceed the amount budgeted for each therefor in the Budget for such period by more than ten percent (10%) of the budgeted amount for each (the "**Authorized Variance**").<br><br>*See* Interim Order ¶ 11(c) & (d). |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | 1.  Entry of Interim Order approving DIP Loan Agreement by July 29, 2020.<br><br>2.  Debtor's filing motion for approval of Bid Procedures or Sales Procedures acceptable to Lender by August 11, 2020.<br><br>3.  Entry of Final Order approving the DIP Financing by August 25, 2020. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| | 4. Entry of Order Approving Bid Procedures or Sales Procedures by August 31, 2020.<br><br>5. Auction of assets (assuming qualified bids are submitted per bid procedure) October 5, 2020.<br><br>6. Entry of order approving sale of substantially all of Debtor's assets by October 14, 2020.<br><br>7. Closing of sale of substantially all of Debtor's assets by October 29, 2020<br><br>See DIP Financing Agreement §1.2 |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | Subject to the Carve-Out, the Debtors' obligations under the DIP Financing will:<br><br>(a) be secured by a perfected first-priority priming lien on the encumbered DIP Collateral (the "**DIP Liens**"), subject only to the Permitted Prior Liens, a first priority security interest in and lien on all unencumbered DIP Collateral, and a junior security interest in and lien on all DIP Collateral that is subject to a Permitted Prior Lien; and<br><br>(b) constitute allowed super-priority administrative expense claims, pursuant to section 364(c) of the Bankruptcy Code, having priority over all administrative expenses specified in or ordered pursuant to the Bankruptcy Code (the "**DIP Superpriority Claims**").<br><br>*See* Interim Order ¶¶ 5, 7; DIP Financing Agreement §4.17 |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides a "Carve-Out" of certain statutory fees and allowed professional fees of the Debtor and any official committee of unsecured creditors appointed in the chapter 11 case pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 20; DIP Financing Agreement § 1.2. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Financing Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings, including without limitation:<br><br>• Failure to make payment of principal or interest under the DIP Financing Agreement and failure to pay any other amounts under the DIP Financing Agreement within three (3) Business Days of when due;<br><br>• Subject to Authorized Variances, the failure to comply with the Budget;<br><br>• Failure to comply with covenants under the DIP Financing Agreement or DIP Documents;<br><br>• Failure to comply with the Chapter 11 Milestones;<br><br>• Inaccuracy of representations or warranties;<br><br>• Debtors shall default in any material respect in the performance of or compliance with any term contained in the DIP Financing Agreement or any of the other DIP Documents and such default shall not have been remedied or waived within thirty (30) days after the earlier of the knowledge of any Authorized Officer of any Loan |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| | Party, as applicable, of such breach or failure and the date notice thereof is received by the Debtors from the DIP Lender; |
| | • Any money judgment, writ or warrant of attachment, or similar process involving an amount individually or in the aggregate in excess of one hundred thousand dollars ($100,000) (to the extent not adequately covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company does not dispute coverage) shall be entered or filed against either Debtor or any of its assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days (or in any event later than the date that enforcement proceedings shall have been commenced by any creditor upon such judgment order or five (5) days prior to the date of any proposed sale thereunder); |
| | • A change of control shall occur; |
| | • The Debtors shall replace the operator of any of the Operated Oil and Gas Properties without the consent of the DIP Lender; |
| | • A material provision of any DIP Document is no longer valid and binding on the Debtors; |
| | • The occurrence of any "Event of Default" under the DIP Orders; |
| | • The Debtors propose a plan of reorganization or liquidation that both (i) does not contemplate the payment in full in cash of the DIP Financing on the Maturity Date and (ii) is not otherwise acceptable to the DIP Lender; |
| | • The appointment of a Chapter 11 trustee or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | • There shall occur a change or transfer of venue relating to the Chapter 11 Cases from the United States Bankruptcy Court for the Southern District of Texas; |
| | • Any creditor of the Debtors shall be granted relief from the stay in respect of any DIP Collateral; or |
| | • An examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee is appointed in one or more of the Chapter 11 Cases. |
| | *See* Interim Order ¶¶ 7(e), 26; DIP Financing Agreement § 7.1. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Subject to paragraph 16 of the Interim Order, the automatic stay is vacated and modified to the extent necessary to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform any and all acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to incur any and all liabilities and obligations, including all the DIP Obligations, as contemplated under the Interim Order and the DIP Documents; (d) the Debtors to pay any and all amounts as provided in the Interim Order and in the DIP Documents; (e) the DIP Lender to retain and apply payments made in accordance with the DIP Documents and the Interim Order; (f) subject to paragraph 16 of the Interim Order (*Rights and Remedies*), the DIP Lender to exercise the rights and remedies provided for under the Interim Order and the DIP Documents, as applicable; and (g) the implementation of any and all of the other terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Documents. The automatic stay is vacated and modified without requiring further order from the Court and without the need for filing any motion for relief from the automatic stay |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) of the Complex Case Procedures |
|---|---|
| | or any other pleading, to the extent necessary to permit the DIP Lender to, immediately upon the occurrence and during the continuance of any Event of Default, (a) send written notice of the occurrence of an Event of Default (such notice, the "**Event of Default Notice**") and/or (b) without limitation and without prior notice, terminate commitments under the DIP Documents, pursuant to and subject to the terms and conditions set forth in the DIP Financing Agreement and in this Interim Order. Upon the occurrence and during the continuation of an Event of Default, the DIP Lender may file an expedited motion seeking relief from the automatic stay (the "**Stay Relief Motion**") in order to (a) accelerate the DIP Obligations and (b) permit the DIP Lender to exercise any or all of its rights and remedies set forth in the DIP Orders or the DIP Documents, including without limitation, to foreclose on the DIP Collateral. The Debtors shall not object to the Stay Relief Motion being heard on an expedited basis so long as the Stay Relief Motion is heard on at least five (5) Business Days' notice. After the DIP Lender has sent the Event of Default Notice, any obligation otherwise imposed on the DIP Lender to provide any loans or advances under the DIP Documents shall be immediately suspended, unless otherwise ordered by the Court or to fund the Carve-Out as provided herein. Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may (a) use the proceeds of the DIP Financing (to the extent drawn prior to the occurrence of Event of Default) to (i) fund operations in accordance with the DIP Financing Agreement and the Budget and (ii) fund the Carve-Out and (b) seek a determination at the hearing on such Stay Relief Motion whether an Event of Default has occurred, and the appropriate remedy if an Event of Default has occurred. Notwithstanding the occurrence of an Event of Default, the Maturity Date, and/or termination of the commitments under the DIP Financing Agreement, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Documents and this Interim Order shall survive. *See* Interim Order ¶¶16. |
| **Waiver of Rights Under Section 506(c)** Bankruptcy Rule 4001(c)(1)(x) | The Interim Order waives the Debtors' rights under section 506(c) of the Bankruptcy Code, subject to the entry of the Final Order. *See* Interim Order ¶¶ 23. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for a customary waiver/modification of applicability of non-bankruptcy law to the perfection or enforcement of liens. *See* Interim Order ¶ 13 |

## IV.  BASIS FOR RELIEF REQUESTED

### A.  The Debtors Should Be Authorized to Obtain Post-Petition DIP Financing

25.   Section 364(b) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b).

26.   If a debtor cannot obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a bankruptcy court can authorize the incurring of debt:

> (1)     with priority over an or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c)(1) – (3).  Further, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain post-petition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.  11 U.S.C. § 364(d).

27.   Additionally, Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for post-petition financing and specifies, *inter alia*, the content, hearing and notice requires of the motion.  *See* Fed. R. Bankr. P. 4001(c)(1) - (3).

28.   In seeking the approval of a post-petition loan, bankruptcy courts consider the following factors in determining whether obtaining post-petition financing pursuant to section

364(c) is appropriate: (i) whether the debtor is unable to obtain unsecured credit under section 364(b); (ii) whether the transaction is necessary to preserve the assets of the debtor's estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

29.    In considering these factors, courts grant considerable deference to a debtor's business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving post-petition financing on an interim basis as exercise of debtor's business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

30.    The Debtors propose to obtain the DIP Financing, in part, by providing DIP Liens and DIP Superpriority Claims pursuant to section 364(c) of the Bankruptcy Code.  Significantly, the Debtors intend to provide the DIP Lender with first priority liens on substantially all of the

Debtors' assets constituting the DIP Collateral as consideration for the DIP Financing and use of

the DIP Lender's cash collateral (the "**Cash Collateral**").  As set forth below, the Debtors submit

that the Motion and the DIP Financing Agreement satisfy the requirements of the Bankruptcy Code

and Bankruptcy Rules and should be approved by the Court.

<em>i.    <u>The Debtors Have Been Unable to Obtain an Offer for Unsecured Financing</u></em>

31.     Prior to the Petition Date, the Debtors sought out unsecured credit in an effort to

obtain the necessary financing to preserve and protect the value of their estates.  The Debtors have

been unable to obtain unsecured credit from any third parties allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code.  The DIP Lender is unwilling to make

any loan to allow the Debtors to move forward with reorganization without a first lien on the

Debtors' assets. Given the exigent circumstances of these Chapter 11 Cases, the Debtors believe

that a first lien would also be required by any other prospective lender, assuming one could be

found.  Thus, notwithstanding the insider status of Arcadius, the Debtors believe that the DIP Liens

afforded under the DIP Financing may be incurred by the Debtors, and that priming the liens of

ETC and the M&M Lienholders, if any, on the Prepetition Collateral provides the best chance for

such creditors to recover on their outstanding claims.

<em>ii.    <u>The DIP Financing is Necessary to Preserve Estate Assets</u></em>

32.     The Debtors require additional funds to sustain their ongoing operations during the

Chapter 11 Cases.  The Debtors submit that entering into the DIP Financing Agreement constitutes

a sound exercise of their business judgment because it will allow the Debtors to maintain the

current level of operations needed to preserve estate value and progress towards a sale process.

Without approval of the DIP Financing, the Debtors will unable to pay their employees, maintain

the operational level needed to preserve estate value, or complete the King of the Hill Well and

19

add significant value to the estates.  The Debtors believe completion of the King of the Hill Well is vital to obtaining the maximum available price for the Debtors' assets in a sale process pursuant to section 363 of the Bankruptcy Code. Accordingly, the Debtors submit that the DIP Financing should be approved by the Court because it is vital to preserving estate value and is in the best interests of the Debtors, creditors and all parties in interest.

        *iii.*     *The Terms of the DIP Financing Are Fair and Reasonable*

33.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

34.    Here, the terms of the DIP Financing Agreement and DIP Obligations are fair and reasonable in light of the circumstances of these Chapter 11 Cases.  The terms of the DIP Financing Agreement and Interim Order have been heavily negotiated, and although the DIP Financing Agreement provides for first liens on the Debtors' DIP Collateral, the Debtors are only priming certain prepetition liens on the Prepetition Collateral because the Debtors' other producing wells are unencumbered. As set forth above, given that the Debtors cannot generate sufficient unencumbered cash to sustain their operations or complete the King of the Hill Well, the Debtors submit that they could never obtain a loan under equal or better terms if they had to go into the capital markets, and that the DIP Financing is necessary and appropriate under the circumstances of these Chapter 11 Cases.

35.     Moreover, the DIP Financing is designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through a robust sale process. With the Court's approval of the DIP Financing, the Debtors will be in a position to implement a going concern sale of their valuable oil and gas assets in accordance with the Milestones set forth in the DIP Financing Agreement.  In light of the foregoing, the Debtors, exercising their business judgment and discretion, submit that the terms of the DIP Financing Agreement should be approved in all respects.

**B.      Use of Cash Collateral**

36.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral if each entity that has an interest in such cash collateral consents or if the court, after notice and a hearing, authorizes the use of the cash collateral. 11 U.S.C. § 362(c)(2).   Cash collateral is defined as, "[C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest […]."  11 U.S.C. § 363(a).

37.     Bankruptcy Code section 363(c)(3) requires a court to condition a debtor's use of cash collateral as is necessary to provide adequate protection of the interest in the cash collateral claimed by a party.  11 U.S.C. § 363(c)(3).  Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property … proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

38.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case … but its focus is protection of the secured creditor from

diminution in the value of its collateral during the reorganization process." *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  Examples of adequate protection are provided for in section 361 and include, but are not limited to: (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property.  *See In re C.G. Chartier Constr., Inc.*, 126 B.R. 956, 960 (E.D. La. 1991).

39.     As set forth above, in order to finance ongoing operations and drill the King of the Hill Well, the Debtors and the prepetition secured lender, ETC, entered into the ETC Loan Documents.  Specifically, ETC loaned Debtor BRP Vista Grande the amount of six million dollars ($6,000,000.00) to drill and complete the King of the Hill Well, and Debtor Brahman guaranteed such loan.  The King of the Hill Well was intended to serve as the Prepetition Collateral in accordance with the ETC Loan Documents.  As work on the King of the Hell Well continued in the months leading up to the Petition Date, various trade creditors also asserted M&M Liens on the same Prepetition Collateral.

40.     The Debtors are requesting authority to use the full amount of the DIP Lender's Cash Collateral, and any other cash collateral in connection with Prepetition Collateral of ETC and those certain holders of M&M Liens for the purposes and amounts set forth in the Budget.

41.     The DIP Lender consents to the use of Cash Collateral.  As of the filing of this Motion, ETC and the M&M Lienholders have not indicated their consent to the (i) financing arrangements contemplated by the DIP Documents and (ii) the Debtors' proposed use of Cash

Collateral on the terms and conditions of the Interim Order. However, because ETC failed to perfect its prepetition liens on the Prepetition Collateral, the Debtors' submit that under established black-letter law, ETC's liens are clearly avoidable, and will likely be avoided in an adversary to be filed in these Chapter 11 Cases. Moreover, both ETC and the M&M Lienholders will be adequately protected from the diminution in value on the Prepetition Collateral because the Debtors intend to use the DIP Financing to complete the King of the Hill Well during these Chapter 11 Cases. Upon completion of the King of the Hill Well, the value of the Prepetition Collateral would add substantial value to the estates in an any sale process contemplated by the Debtors.

42. If the King of the Hill Well is not completed during the Chapter 11 Cases because the Debtors are unable to obtain post-petition secured financing, then all creditors asserting liens against the Prepetition Collateral will be significantly harmed. Specifically, the Debtors would be forced to liquidate their assets, and an un-finished well requiring significant capital expenditure to complete would be of little value to the estates. Further, to the extent any party who purchased the assets would be willing to expend the time and resources necessary to complete the work, there would be a substantial delay in the process. Thus, ETC and the M&M Lienholders have a vested interest in seeing the King of the Hill Well completed in a timely fashion in these Chapter 11 Cases. Accordingly, the Debtors seek authority to use Cash Collateral out of an abundance of caution and respectfully submit that (i) use of Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses; and (ii) is in the best interests of the Debtors, their estates and their creditors as the Debtors advance toward a sale process in these Chapter 11 Cases.

43. The Debtors do not intend to provide adequate protection to ETC or the M&M Lienholders for the use of Cash Collateral. Specifically, the Debtors submit that adequate protection in any form is not necessary or appropriate in light of (i) ETC's failure to perfect its

liens on the Prepetition Collateral; and (ii) the value that will be added to the estates upon completion of the King of the Hill Well, which serves as the Prepetition Collateral for the M&M Lienholders.  In the alternative, to the extent the Court orders adequate protection to, the Debtors believe that any form of adequate protection should be minimal, and any replacement liens should be subordinate to the liens granted to the DIP Lender pursuant to the Interim Order and Final Order granting the relief requested in this Motion.  Indeed, the Debtors believe the priming position of the DIP Liens is necessary and appropriate under the unique circumstances of these Chapter 11 Cases, as more fully set forth above.  Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to use Cash Collateral, in accordance with and pursuant to the terms and conditions contained in the Interim Order.

## V.    REQUEST FOR APPROVAL POST-PETITION RETAINERS

44.    Bankruptcy Local Rule 2016-1(b) provides that "[i]n chapter 11 cases, retainers may be deposited with attorneys or accountants only (i) prior to the filing of the petition; or (ii) pursuant to a Court order, if paid after the filing of the petition."  B.L.R. 2016-1(b).  The Budget approved by the Debtors and DIP Lender provides for, *inter alia*, payment of post-petition retainers for the Debtors' proposed professionals in the amount of $50,000 each.  By this Motion, the Debtors request that the Court approve payment of retainers to be deposited in the client trust account by the respective professionals in accordance with the Budget, the Interim Order, and any Final Order entered by the Court.  Given the exigent circumstances of these Chapter 11 Cases and the limited cash available to the Debtors prior to the Petition Date to retain professionals, the Debtors believe that payment of a post-petition retainer to the Debtors' two retained professionals is necessary and appropriate under the circumstances.

## VI.   <u>REQUEST FOR FINAL HEARING</u>

45.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

46.    Pursuant to Bankruptcy Rules 4001(b)(2) and the Complex Case Procedures, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## VII.   <u>WAIVER OF BANKRUPTCY RULE 4001(a)</u>

47.    The Debtors request a waiver of the stay of effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  As set forth herein, the use of Cash Collateral is necessary to allow the Debtors to operate their businesses and meet their working capital needs.  Furthermore, allowing the Debtors' use of Cash Collateral will prevent irreparable harm to the Debtors' estates.  Accordingly, the Debtors submit that ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3).

## VIII.   <u>EMERGENCY CONSIDERATION</u>

48.    Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first  twenty-one (21) days after the commencement of a chapter 11

case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the such operations and cause irreparable harm. Furthermore, the failure to receive the requested relief on an emergency basis would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring objectives. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## IX.   NOTICE

49.     Notice of this Motion has been provided by facsimile, email, overnight courier and/or hand delivery, to: (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the Debtors' prepetition secured lender, ETC Texas Pipeline, Ltd.; (iii) the 30 largest unsecured creditors of each of the respective Debtors (as found on Official Form 204); (iv) the Internal Revenue Service; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002. Under the circumstances, such notice of the hearing and the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 9014, the Bankruptcy Local Rules and the Complex Case Procedures. The Debtors submit that no other or further notice need be provided.

## X.   RESERVATION OF RIGHTS

50.     Nothing contained herein shall be deemed: (i) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (ii) an impairment or waiver of the Debtors' or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property or its estate; (iii) a promise or requirement to pay any prepetition claim; (iv) an assumption, adoption, or

rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (v) an implication or admission that any particular claim is of a type specified or defined in this Motion, or any order granting the relief requested by this Motion; (vi) an implication, admission, or finding as to (a) the validity, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate or (b) the applicability of any exception or exclusion from property of the estate under section 541 of the Bankruptcy Code or other applicable law; (vii) an impairment or waiver of any claims or causes of action which may exist against any entity; or (viii) a waiver of any Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## XI.  **PRAYER**

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form submitted herewith: (i) authorizing the Debtors to obtain the DIP Financing on an interim basis pursuant to the terms of the DIP Financing Agreement; (ii) authorizing the continued use of Cash Collateral as necessary for the interim period in accordance with the Budget; (iii) setting a Final Hearing as soon as practicable to consider approval of the Motion on a final basis and entry of a Final Order; and (iv) granting the Debtors such other and further relief as this Court may deem just and proper.

Respectfully submitted on the 27th day of July, 2020.

**OKIN ADAMS LLP**

By: ____/s/ *Matthew S. Okin*_____
       Matthew S. Okin
       Texas Bar No. 00784695
       Email: mokin@okinadams.com
       Ryan A. O'Connor
       Texas Bar No. 24098190
       Email: roconnor@okinadams.com
       1113 Vine St., Suite 240
       Houston, Texas 77002
       Tel: 713.228.4100
       Fax: 888.865.2118

**PROPOSED ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF ACCURACY PURSUANT TO B.L.R. 9013-1(i)**

     In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify to the accuracy of the matters set forth in the foregoing Motion.

By: ____/s/ *Matthew S. Okin*_____
       Matthew S. Okin