**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **BRAHMAN RESOURCE** | § | **Case No. 20-33697** |
| **PARTNERS, LLC,** *et al.,* | § | |
| | § | **Chapter 11** |
| **Debtors.[1]** | § | |
| | § | **(Joint Administration Requested)** |

**DECLARATION OF CLAY BORDER,
CHIEF EXECUTIVE OFFICER OF THE DEBTORS, IN SUPPORT
OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Clay Border, hereby submit this declaration (this "**Declaration**") under penalty of perjury:

1.      I am the President, Chief Executive Officer, and member of the Board of Directors (the "**Board**") of Brahman Resource Partners, LLC.  I have served in such capacity since 2016.  In total, I have over seventeen (17) years of research, investment banking, and advisory experience in the oil and gas industry, including managing E&P and service companies and their assets.

2.      The debtors and debtors in possession (the "**Debtors**") in these chapter 11 bankruptcy cases include Brahman Resource Partners, LLC ("**Brahman**"), a Texas limited liability company, and BRP Vista Grande, LLC ("**BRP Vista Grande**"), a Texas limited liability company.  Brahman is the sole member and manager of BRP Vista Grande.

3.      I am generally familiar with the Debtors' day-to-day operations, oil and gas assets, financial affairs, and books and records.  Except as otherwise indicated herein, all facts

---

[1] The debtors and debtors in possession these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Brahman Resource Partners, LLC (7253); and BRP Vista Grande, LLC (1481).  The Debtors' service address is: 8900 Eastloch Dr., Suite 235, Spring, Texas 77379.

set forth in this Declaration are based upon my personal knowledge of the Debtors' employees, operations, assets, and finances; information learned from my review of relevant documents; information supplied to me by other members of Brahman's management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations, financial condition, and the oil and gas industry generally. I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein.

4.     On July 26, 2020, the Debtors filed voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11, title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). To minimize the adverse effects on their businesses, the Debtors have filed motions seeking various types of "first day" relief (the "**First Day Motions**") to allow the Debtors to meet their obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value. I further believe that the relief sought in each First Day Motion constitutes a critical element in moving towards a sale of substantially all of the Debtors' assets, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference, as applicable.

5.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' business operations, corporate history, and assets;

- **Part II** describes the Debtors' prepetition capital structure and indebtedness;[2]

- **Part III** describes the circumstances leading to the commencement of these Chapter 11 Cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

## I.   COMPANY OVERVIEW

### A.   Debtors' History and Hierarchy

6.      Formed on or about June 17, 2016, Brahman is a development stage independent oil and gas company focused on leasing, exploring and developing acreage in the liquids rich Southern Shelf of the Delaware Basin and Val Verde Basin, and specifically targeting the Woodford and Barnett formations.  Brahman was formed by, *inter alia*, an initial commitment of twelve million dollars ($12,000,000) from Arcadius (SW) Energy Capital, LP ("**Arcadius**"), a Delaware limited partnership.[3]  Arcadius is the controlling member and manager of Brahman, holding 97.7% of the Class A Units, as defined in that certain Amended and Restated Limited Liability Company Agreement of Brahman Resource Partners, LLC dated as of February 21, 2018 (the "**Company Agreement**").   Pursuant to the Company Agreement, the Board of Brahman consists of three (3) board members designated by Arcadius as the controlling Class A member, and two (2) board members designated by the Class B members of the Debtor.   In anticipation of filing these Chapter 11 Cases, the Board authorized the creation of a special committee (the "**Special Committee**") to consist of certain new managers and disinterested

---

[2] Many of the financial figures that will be presented in this Declaration are unaudited and potentially subject to change but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

[3] The commitment from Arcadius had potential availability up to forty million dollars ($40,000,000).

directors to consider proposals and make recommendations to me, as the Authorized Representative of the Debtors, during these Chapter 11 Cases.  Arcadius will not have any involvement on the Special Committee, and is represented by separate counsel in these Chapter 11 Cases.

7.     Brahman is the sole member and manager of BRP Vista Grande.  BRP Vista Grande was formed on or about July 10, 2019 as a special purpose entity to accept the assignment of certain leases from Brahman, and to explore and develop a certain well in the Middle Woodford liquids window of the Southern Shelf in the Delaware Basin and Val Verde Basin.  As more fully set forth below, BRP Vista Grande was formed as a result of Brahman's an agreement with ETC Texas Pipeline, Ltd. ("**ETC**"), a reputable hydrocarbon gatherer, whereby ETC agreed to loan money to BRP Vista Grande to facilitate the drilling and development of the new well.

**B.     Corporate Office**

8.     The Debtors maintain their principal place of business at 8900 Eastloch Dr., Suite 235, Spring, Texas 77379.   The Debtors' office lease in Spring presently covers approximately 2,132 square feet of office space pursuant to that certain lease (the "**Office Lease**") between Brahman and Citywide Home Loans, LLC, which commenced on April 1, 2019. The term of the Office Lease was for a period of thirty (30) months and expires on September 30, 2021.

9.     The base monthly rent under the Office Lease is $3,120.  However, the Debtors have informal sublease agreements for office space with two different third-parties, Contract Oil & Gas and Trek Oil & Gas, pursuant to which the sublessees pay the Debtors approximately $2,290 per month in rent and reimbursable costs.

4

C.      **Current Oil and Gas Assets and Operations**

 i.      *Overview of Working Interests*

 10. The Debtors focus their efforts on acquiring and developing high-potential exploration and production assets in the Southern Shelf of the Delaware Basin or Val Verde Basin in Pecos County, and Terrell County, Texas.  Currently, the Debtors' asset portfolio consists of approximately 470 acres of producing oil and gas mineral leases (out of 17,045 gross acres and 8,222 net leased acres) in the Northeast corner of Pecos County and the Northwest portion of Terrell County.

 11. The Debtors hold leases and working interests (the "**Working Interests**") in two (2) producing wells, and one (1) well that is nearing completion.  The Debtors' Working Interests in the field include the following:

| Well Name | Description |
|---|---|
| William Edwards Well | Drilled in February 2014. Confirmed dry gas in the Woodford window. |
| ACU 37-1H Well | Drilled in December 2014. Confirmed liquids in the Woodford fairway and Middle Woodford landing. |
| King of the Hill Well | Development in process in the Middle Woodford liquids window.  Flowback and tie-in scheduled for September 2020. |

 12. Brahman acquired the Working Interests in 2016 with the ACU 37-1H Well and William Edwards Well already on production, and did a re-completion of the ACU 37-1H Well in late 2018.  The current production from the two wells is approximately thirty-five (35) Bopd and seven hundred fifty (750) Mcfd.

 13. In connection with its Working Interests, Brahman entered into that certain Operating Agreement (the "**Operating Agreement**") and that certain Participation Agreement

(the "**Participation Agreement**"), each dated as of March 27, 2018, with Kerogen Texas Energy L.P. ("**Kerogen**").  Pursuant to the Operating Agreement, Brahman serves as the operator of the applicable Kerogen farm-in leases in the contract area on behalf of Kerogen as the non-operator. The Operating Agreement creates certain non-operating working interests and lease obligations, pursuant to which the Debtors must (i) market oil and natural gas production on behalf of the owners of such non-operating working interests and (ii) remit to the holders of such interests their share of net revenue from any subsequent wells located on the applicable leases.  Notably, however, the contract area under the Operating Agreement does not burden the entirety of the Debtors' leasehold interests. Specifically, the contract area of the Operating Agreement does not cover the William Edwards Well or the ACU 37-1H Well, but only covers the King of the Hill Well, subject to certain return of capital thresholds in the Participation Agreement, as well as Kerogen's obligation to pay its share of costs, as more fully set forth in the Participation Agreement.  As of the Petition Date, the requirements of the Participation Agreement have not been satisfied, and Kerogen does not have an interest in the King of the Hill Well.

   ii.    *King of the Hill Well*

   14.    In early 2019, the Debtors initiated a new program to confirm their technical analysis regarding the Middle Woodford liquids window. In order to commence further field development, the Debtors required and sought out additional capital to drill and develop the King of the Hill Well.  In or around June 2019, Brahman engaged in substantive discussions with ETC, the only hydrocarbon gatherer in the area, regarding financing a portion of the new exploration well and related operations.

   15.    As negotiations progressed, Brahman agreed to create a special purpose entity, BRP Vista Grande, to own and operate the King of the Hill Well, and hold the applicable leases

assigned by Brahman covering the acreage where the King of the Hill Well was intended to be drilled.  BRP Vista Grande was formed on or about July 10, 2019 for that purpose.  Thereafter, the Debtors and ETC entered into those certain ETC Loan Documents (defined below) to drill and complete a new well – the King of the Hill Well.

16.    Spudding of the King of the Hill Well began in November 2019.  Work remains ongoing, and the Debtors intend to complete the King of the Hill Well during these Chapter 11 Cases.  Specifically, flowback and tie-in of the well is currently scheduled for September 2020, pending Court approval of the requisite debtor in possession financing as more fully set forth herein.

17.    The map below sets forth a visual representation of the geographical locations of the Debtors' current operations and leases:[4]



---

[4] Current production from the ACU 37-1H Well and William Edwards Well is highlighted in yellow, and the anticipated production from the King of the Hill Well is highlighted in orange.

7

## II.   PREPETITION DEBT

### A.   Secured Debt

*i.   The ETC Loan Documents*

18.     In connections with their negotiations with ETC regarding financing for the King of the Hill Well, ETC required Brahman to assign the applicable leasehold interest to the newly created special purpose entity, BRP Vista Grande, such that BRP Vista Grande would own the collateral and ETC's liens would not be junior in interest to preexisting liens, if any.  On or about August 2, 2019, Brahman executed that certain Omnibus Consent (the "**Assignment**") pursuant to which Brahman partially assigned the applicable leases to BRP Vista Grande.

19.     Thereafter, the Debtors and ETC entered into those certain agreements (the "**ETC Loan Documents**") consisting of: (i) Gas Gathering and Processing Agreement (the "**Gathering Agreement**") dated as of October 1, 2019; (ii) Financing Agreement (the "**Financing Agreement**") dated as of October 3, 2019; (ii) Secured Promissory Note (the "**Promissory Note**") dated as of October 3, 2019; (iv) Limited Parental Guaranty (the "**Guaranty**") dated as of October 3, 2019; and (v) Deed of Trust, Mortgage, and Security Agreement (the "**Deed of Trust**") dated as of October 3, 2019.

20.     Pursuant to the ETC Loan Documents, ETC loaned BRP Vista Grande the amount of six million dollars ($6,000,000.00) to drill and complete the King of the Hill Well, and Debtor Brahman guaranteed such loan.  The King of the Hill Well was intended to serve as the collateral under the ETC Loan Documents (the "**Prepetition Collateral**").

21.     Prior to the Petition Date, in preparation for filing these Chapter 11 Cases, the Debtors undertook an analysis of the liens asserted against them.  During such investigation, the Debtors discovered that neither the Assignment nor the Deed of Trust were filed in the property

records of Pecos County or Terrell County.  Because ETC failed to file the Deed of Trust, it did not perfect its liens on the Prepetition Collateral.  Moreover, because the Assignment was never filed, the Debtors do not believe the Assignment is effective as to any third-parties without notice of such Assignment, to the extent any equitable transfer even occurred.  Finally, the descriptions of leases and wells contained within the exhibits to the Deed of Trust and Assignment were discovered to be inaccurate, and as a result of this error, they failed to capture the ultimate location of the King of the Hill Well.

22.     In light of the foregoing, the Debtors believe that ETC may hold valid, but unperfected, liens in the Prepetition Collateral that are clearly avoidable under the provisions of the Bankruptcy Code and applicable law.

ii.     *The M&M Liens*

23.     After ETC funded the required amount under the ETC Loan Documents, the Debtors began developing the King of the Hill Well in November 2019.  As part of this process, the Debtors engaged in numerous strategic relationships with then-existing and new service providers.  However, due to market conditions and ongoing liquidity issues, the Debtors became unable to pay these providers in the ordinary course of business.  Numerous vendors have asserted and recorded mechanics and materialmens liens (the "**M&M Liens**") against Brahman and the Prepetition Collateral.  Several of these parties (the "**M&M Lienholders**") have also initiated litigation against Brahman to foreclose on their M&M Liens.

24.     Due to the failure to record both the Deed of Trust and the Assignment, the Debtors believe that the M&M Lienholders are the holders of the senior secured interests in the Prepetition Collateral, and that the Assignment from Brahman to BRP Vista Grande was not effective as to such M&M Lienholders.

25.     In sum, the Debtors have incurred a substantial amount of debt in order to fund their E&P activities and sustain operations.  As of the Petition Date, the Debtors estimate that they were indebted to ETC and the M&M Lienholders in an aggregate amount of approximately $8.2 million, without considering penalties, interest or other fees.  However, the Debtors dispute certain of the M&M Liens asserted by M&M Lienholders and the amounts allegedly owed.

**B.**     **Trade Debt**

26.     In addition to the secured debt owed to ETC and the M&M Lienholders, the Debtors have substantial unsecured debt owed to numerous trade creditors, among other third-parties.  In the ordinary course, the Debtors maintained relationships with various service providers in relation to their oil and gas operations which are critical to maintaining current levels of production.  Due to the various liquidity issues described herein, the Debtors do not have sufficient cash flow to pay the trade payables, and incurred unsecured debt of approximately $4 million.

### III.     EVENTS LEADING TO BANKRUPTCY

**A.**     **In General**

27.     Currently, the Debtors derive the totality of their revenue from the sale of crude oil, natural gas, and natural gas liquids.  As a result, the Debtors' revenues and ultimate profitability, the value of the reserves, their access to capital, and their growth as a company are subject to the prevailing prices of crude oil, natural gas, and natural gas liquids, which have seen a prolonged downturn in commodity prices, including negative prices brought on by the COVID-19 pandemic and other market conditions.

28.     In light of the commodity prices, the Debtors have not been able to generate sufficient cash from operations to satisfy their prepetition indebtedness and various other

obligations as they become due while also funding the completion of the King of the Hill Well. These factors have significantly harmed the Debtors' financial position, and as a result, the Debtors incurred losses from operations in each of the past three fiscal years after substantial capital expenditures were made exploring and developing the Delaware Basin and Val Verde Basin play.

29.    In the months leading up to the Petition Date, the Debtors were unable to supplement their liquidity needs and continue the development of their assets.  Notwithstanding these initial funding from Arcadius, and the subsequent financing from ETC, the Debtors have been unable to make timely payments to certain critical vendors in relation to their operations, and additional financing is needed to complete the King of the Hill Well and add substantial value to the estates.

30.    In sum, the Debtors' inability to service their mounting debt obligations and other trade payable obligations due to the prolonged downturn in oil prices has resulted in a severe cash-flow shortage.  In preparation for filing these Chapter 11 Cases, the Debtors worked diligently to maintain the value of their assets, conserve their remaining cash, fund existing payroll obligations, and certain other trade payables.  Through these Chapter 11 Cases, the Debtors seek protection of the automatic stay while they (i) obtain the necessary debtor in possession financing to sustain their current operations and complete the King of the Hill Well; and (ii) endeavor to complete a sale of substantially all of their assets under section 363 of the Bankruptcy Code.  The Debtors intend to commence a marketing and sale process in accordance with the milestones set forth in the DIP Financing Agreement (defined below) through a third-party auction provider to be determined during these Chapter 11 Cases.

## IV.    FIRST DAY MOTIONS

31.    Below is an overview of the First Day Motions. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtors into the Chapter 11 Cases and minimize disruptions to the Debtors' business operations.   Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

**A.    Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")**

32.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these Chapter 11 Cases.   The Debtors do not seek substantive consolidation.

33.    The Debtors are "affiliates" as defined in Bankruptcy Code section 101(2).  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these Chapter 11 Cases will affect more than one Debtor entity.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.

34.    Parties in interest will not be harmed by the relief requested; rather, the joint administration of these Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, who will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases.  Joint administration also will allow the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on

12

behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be approved by the Court.

**B.      Debtors' Emergency Motion For Entry Of An Order Extending The Time To File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs ("Schedules Motion")**

35.      In the Schedules Motion, the Debtors seek entry of an order: (i) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by twenty-one (21) days, for a total of thirty-five (35) days from the Petition Date, through and including August 30, 2020.

36.      The Debtors have spent, and continue to spend, a substantial amount of time ensuring the Debtors have a smooth transition into chapter 11, with minimal disruptions to the Debtors' businesses.  To prepare the Schedules and Statements, I understand that the Debtors must compile information from books, records, and documents maintained by each of the Debtors, relating to the claims, assets and contracts from each Debtor entity. Given the scope of the Debtors' operations, it will take substantial time to gather and process such information. These tasks also include working with the Debtors' vendors and various other parties in interests to stabilize business operations, a process the Debtors anticipate will exceed the fourteen (14) days provided by the Bankruptcy Code and Bankruptcy Rules. Moreover, the Debtors are currently operating with the minimum number of employees necessary to preserve the value of their estates, and only a few of those employees have detailed knowledge of the Debtors' financial affairs. In light of the significant amount of work required to complete the Schedules

and Statements, as well as the competing demands on the Debtors' employees and professionals to assist in critical efforts to stabilize the Debtors' businesses and negotiate a sale of the Debtors' assets, I believe an extension is necessary.

37.     Further, I believe the requested extension also will aid the Debtors in efficiently preparing accurate Schedules and Statements, as it will allow the Debtors to account for prepetition invoices not yet received or entered into their accounting systems as of the Petition Date, and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary.  As such, I believe the extension will benefit not only the Debtors, but all creditors and other parties in interest. Although the Debtors, with the assistance of their professional advisors, have begun to compile the information necessary for the Schedules and Statements, the Debtors have been consumed with a multitude of other legal, business, and administrative matters in the weeks prior to the Petition Date.  Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

38.     In view of the amount of information that must be assembled and compiled, and the limited time available to do so, I believe that ample cause exists for the requested extension.

**C.     Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests (the "<u>Utilities Motion</u>")**

39.     Pursuant to the Utilities Motion, the Debtors seek entry of an order: (i) approving the Debtors' proposed adequate assurance of payment for future utility services; (ii) prohibiting utility companies from altering, refusing, or discontinuing services; and (iii) establishing

procedure for determining adequate assurance of payment and resolving adequate assurance requests.

40.     As set forth in the Utilities Motion, the Debtors' office facilities require utilities such as electricity, telecommunications, internet and related services (the "**Utility Services**") in connection with their oil and gas operations.  To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.  On average, the Debtors pay approximately $1,125 each month for third-party Utility Services to their various utility service provides (the "**Utility Companies**"), calculated as a historical average payment for the twelve (12) months preceding the Petition Date.

41.     In connection the operation of their businesses and management of their properties, the Debtors obtain Utility Services from a number of Utility Providers.   A nonexclusive list of the Utility Companies that provide Utility Services to the Debtors as of the Petition Date (the "**Utilities Services List**") is attached as Exhibit A to the Utilities Motion.

42.     To the best of the Debtors' knowledge, the Debtors do not have an existing prepayments or deposits with respect to any Utility Companies.  The Debtors are one month in arrears as of the Petition Date with respect to undisputed invoices for prepetition Utility Services.

43.     The uninterrupted continuation of the Utility Services is critical to the Debtors' ongoing business operations throughout the course of these Chapter 11 Cases.  Should any of the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted, negatively impacting the value of their assets and jeopardizing a potential sale during the Chapter 11 Cases.  Accordingly, I believe the Utilities Motion should be approved by the Court.

**D.**     **Debtors' Emergency Motion for Entry of an Order Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records (the "<u>Cash Management Motion</u>")**

44.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to: (a) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; (b) maintain existing business forms; (c) continue the performance their business transactions consistent with the Debtors' historical practices; and (d) waiving the U.S. Trustee Guidelines established by the U.S. Trustee related to cash management systems.

45.     In the ordinary course of business, the Debtors use and maintain certain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms related to their oil and gas operations and assets (collectively, the "**<u>Business Forms</u>**").   Adopting a new set of Business Forms would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay.   To minimize the administrative interruptions and expenses, the Debtors request authority to continue to use their Business Forms substantially in the form existing immediately prior to the Petition Date, without reference to the Debtors' status as "Debtors in Possession" in these Chapter 11 Cases as required by the U.S. Trustee Guidelines.

46.     The Debtors also maintain a cash management system (the "**<u>Cash Management System</u>**") in the ordinary course of business to gather, allocate, transfer, and disburse funds with respect to their operations and to facilitate cash monitoring and reporting.   The Cash Management System is comprised of one (1) active Bank Account at JP Morgan Chase Bank. The Bank is an authorized depository pursuant to the U.S. Trustee Guidelines. As currently established, the Debtors' existing Bank Account and entire Cash Management System function

smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest.

47.     Given the nature of the Debtors' businesses, the uninterrupted use of the Debtors' Bank Account is vital to their operations and overall Cash Management System and will facilitate the Debtors' transition into the Chapter 11 Cases by minimizing delays in paying post-petition debtors and eliminating administrative inefficiencies.  Moreover, maintaining the current Cash Management System will allow the Debtors' limited workforce to attend their daily responsibilities rather than organize and administer a new system in the early days of these Chapter 11 Cases.  Requiring the Debtors to adopt a new cash management system would be costly, burdensome, and disruptive to operations at this critical juncture, and could have a negative effect on the Debtors' ongoing marketing and sale efforts given the established milestones the Debtors must adhere to in the Chapter 11 Cases.

48.     Finally, the Debtors seek a waiver of the U.S. Trustee Guidelines requiring that chapter 11 debtors in possession, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll); and (iii) obtain new checks bearing the designation "Debtors in Possession," along with additional information.

49.     I believe that compliance with these requirements would create substantial and unnecessary administrative burdens, including additional expense, confusion among employees and creditors, and diversion of scarce time and personnel to the detriment of the Debtors as they transition into these Chapter 11 Cases. On the other hand, permitting the Debtors to maintain their existing Bank Account and Cash Management System will prevent the disruption of operations and will not prejudice any party in interest. Further, because the Debtors presently

17

maintain sophisticated, computerized accounting and record keeping systems related to their Bank Account and oil and gas operations, the Debtors will be able to ensure that all prepetition and post-petition transactions are properly accounted for and easily distinguished.  The Debtors intend to continue maintain complete and accurate records of all transfers of funds in and out of the Bank Account.  I therefore believe a waiver of the U.S. Trustee Guidelines is appropriate, as set forth in the Cash Management Motion.

E.      **Debtors' Emergency Motion for Entry of an Order (I) Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) Authorizing the Debtors to Pay Prepetition Wages to Employees and Contractors and (II) Granting Related Relief (the "<u>Employee Wage Motion</u>")**

50.     In the Employee Wage Motion, the Debtors request entry of an order: (i) authorizing, but not directing, the Debtors to (a) pay, in their sole discretion, all obligations incurred under or related to wages, salaries, other compensation, reimbursable expenses, and payroll service fees (collectively, the "**<u>Obligations</u>**") and all costs related to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies in place for their employees (the "**<u>Employees</u>**") and contractors (the "**<u>Contractors</u>**"), as such may be modified, amended, or supplemented from time to time in the ordinary course of business; and (ii) authorizing and directing the Debtors' Banks to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Obligations.

51.     As set forth in the Employee Wage Motion, the Debtors are currently operating with a small, close-knit staff consisting of three (3) salaried Employees and two (2) hourly contract staff.  These Employees and Contractors are vital to maintaining the value of the Debtors' estates as they transition into the Chapter 11 Cases and endeavor to complete a sale of substantially all of the Debtors' assets.  The Debtors utilize the services of a professional

employment organization, Gusto, Inc. ("**Gusto**"), to process payroll and administer Employee benefit plans.  The Debtors submit a net amount of money to Gusto during each pay period, and Gusto then administers the Employee Obligations for the salaried Employees.  Employees are paid every other week via direct deposit from Gusto, which funds are pre-paid to Gusto using funds drawn from the Debtors' operational account at the Bank.  Contractors are paid directly by the Debtors every other week via check or direct deposit from the same account.

52.     The Debtors' description of the payroll process and the prepetition amounts and Obligations due to the Employees and Contractors as set forth in the Employee Wage Motion is accurate.  However, prior to the Petition Date, in order to induce the remaining skeleton staff of Employees and Contractors to continue working for the Debtors through a sale process, the Board of Brahman authorized and approved a resolution changing the payroll amount for salaried Employees, including adding a salaried Employee for Operations, as follows:

| Name and Title | Amount |
| --- | --- |
| Clay C. Border, President & CEO | $12,000 plus taxes and fees paid bi-weekly |
| John Van Fleet, VP of Geosciences | $5,250 plus taxes and fees paid bi-weekly |
| David Myres, VP of Land | $3,646 plus taxes and fees paid bi-weekly |
| Logan Magruder, Operations | $9,000 plus taxes and fees paid bi-weekly |

53.     I believe that the relief requested in the Employee Wage Motion is in the best interest of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  Accordingly, I believe the Court should grant the relief requested in the Employee Wage Motion and authorize the Debtors to honor the Obligations and pay their Employees and Contractors during these Chapter 11 Cases.

**F.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Make Mineral Interest Payments and (II) Granting Related Relief (the "<u>Royalty Motion</u>")**

54.     Pursuant to the Royalty Motion, the Debtors seek entry of an order: (i) authorizing, but not directing, the payment of Mineral Payments or application of funds attributable to the Mineral Interests described in this Declaration; (ii) authorizing all Banks to (a) honor pre-petition checks and electronic payment requests on account of the Mineral Payments, and (b) honor post-petition checks and electronic payment requests in the ordinary course of business on account of the Mineral Payments.

55.     The Debtors operate and have Working Interests in all of their oil and natural gas assets. The Debtors' Working Interests were acquired through written oil and gas mineral lease agreements pursuant to applicable state law and rules established by the Texas Railroad Commission from owners of the underlying mineral interests.  In exchange for conveying to the Debtors the right to explore, drill, and produce oil and gas, these mineral interest owners are entitled to either a share of production, or payments in lieu of a share of production (a "**<u>Royalty Interest</u>**"). In addition to Royalty Interests, the Debtors' Working Interests may be subject to or burdened by various other interests in minerals, production, or profits, which may have been created before or after the oil and gas lease was entered into or which may exist in the absence of an oil and gas lease.  Such other interests can take many forms, including overriding royalty interests, non-participating royalty interests, net profit interests, production payments, pooled interests, and unleased mineral interests (the "**<u>Other Interests</u>**," and collectively with the Royalty Interests, the "**<u>Mineral Interests</u>**").

56.     In order to maintain their leases, the Debtors must make payments on account of the Mineral Interests (the "**<u>Mineral Payments</u>**"). The failure to do so could have severe

consequences. Mineral Payments are governed by the terms of the leases and state statutory frameworks that set strict payment deadlines and contain enforcement mechanisms including lien rights, interest, fines, recovery of costs and attorneys' fees, and treble damages. Failure to make Mineral Payments could expose the Debtors to such enforcement actions and result in actions seeking the forfeiture, cancellation, or termination of the oil and gas leases.

57.     The Mineral Payments vary from month to month due to many factors, such as commodity pricing, specific terms of underlying agreements, forced poolings, changes in ownership, title dispute resolutions, changes in the amount or type of mineral, and varying cost deductions relating to, among other things, gathering, marketing, and transportation costs. These Mineral Payments are generally remitted by the Debtors to Mineral Interest owners (the "**Mineral Payees**") throughout the course of a given month for oil and gas production from two months prior. As a result of the time required to market and sell the production and the detailed accounting process required each month to accurately disburse the resulting proceeds, Mineral Payments generally are made within sixty (60) days after the end of the month of production of the underlying oil and gas.

58.     In the twelve (12) months prior to the Petition Date, the Debtors made Mineral Payments totaling approximately $204,400.98. As of the Petition Date, the Debtors estimate that they owe approximately $135.75[5] to the Mineral Payees. Of that amount, none of the Mineral Payments are attributable to Royalty Interest suspense funds.

59.     Similarly, payments on account of Non-Op Working Interests are not uniform, and are not entirely predictable on a month-to-month basis depending on the production from the

---

[5] The Debtors are in the process of calculating the outstanding Mineral Payments and reserve the right to supplement this information at or before the hearing on the First Day Motions, as necessary.

Debtors' oil and gas assets.  I understand that failure to satisfy Mineral Interest obligations and Non-Op Working Interest obligations as they become due will severely impact the Debtors' drilling and production operations, production may completely cease for certain wells, or leases could be lost.  The Debtors' ongoing operations, value of their assets, and sale of substantially all of their assets depend, to a significant degree, on their relationship with Mineral Payees and Non-Op Working Interest holders to whom payments are owed in the ordinary course of business. If these relationships are harmed by failing to make the appropriate Mineral Payments, the Debtors may encounter particularized controversies with each counterparty, unnecessary costs and distractions, and corresponding harm to their businesses to the detriment of all parties. As a result, I believe the Mineral Payments and related obligations are critical to enable the Debtors to continue to operate their businesses in these Chapter 11 Cases without interruption and are therefore in the best interests of the Debtors, their estates, creditors, and all parties in interest.

**G.**     **Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Operating, Marketing, and Transportation Expenses; and (II) Granting Related Relief (the "<u>Operating Expenses Motion</u>")**

60.     Pursuant to the Operating Expenses Motion, the Debtors seek entry of interim and final orders: (i) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain undisputed, liquidated prepetition amounts owing on account of  lease operating expenses, marketing, and transportation expenses; (ii) authorizing and directing Banks to receive, process, honor, and pay all checks and electronic payment requests made by the Debtors related to such obligations; and (iii) granting related relief.

61.     **Lease Operating Expenses**.  As operators of all of their oil and gas leases, the Debtors are responsible for paying all lease operating expenses on account of their Working

22

Interests (collectively, the "**Lease Operating Expenses**").  These Lease Operating Expenses typically include: (i) payments to various service providers for field compression, dehydration, and gathering; (ii) payments to other third-parties that perform labor or furnish materials, equipment, or supplies used primarily in the production and maintenance of oil and natural gas property; and (iii) payments made to owners of property interests that are critical to the operating and maintain the oil and natural gas property.

62.    Lease Operating Expenses are not uniform, and therefore are not entirely predictable on a month-to-month basis.  In the twelve (12) months preceding the Petition Date, the Debtors paid approximately $254,646. As of the Petition Date, the Debtors estimate that they have approximately $26,588.19 of Lease Operating Expenses outstanding.

63.    **Marketing and Transportation Expenses**.  To effectively market or sell production from their oil and gas leases, the Debtors, as operator, have contractual arrangements (the "**Marketing Arrangements**") pursuant to which third-parties will charge the operator for gathering, transportation, treating, dehydration, compression, processing, and fractionation, and other similar services necessary to get the unrefined oil and natural gas produce from wells to market in a condition ready for sale (such charges are, collectively, the "**Marketing Expenses**"). The Debtors' compliance with the Marketing Arrangements and timely payment of the Marketing Expenses is critical to the Debtors' ability to receive revenue from production that they market on behalf of themselves and holders of Non-Op Working Interests (the "**Marketed Production**").  Failure to receive such revenue would jeopardize the Debtors' ability to make timely payments to third-parties holding an interest in production, such as holders of Mineral Interests and Non-Op Working Interests described above.

64.     The Debtors' counterparties to the Marketing Arrangements commonly will have possession and, at times, title to the Marketed Production. I understand that failure to pay Marketing Expenses when due could result in such counterparties refusing to release production or revenues associated with the Marketed Production in their possession or refusing to accept delivery of additional Marketed Production in the ordinary course.  Moreover, certain of the counter-parties to the Debtors' Marketing Arrangements, such as ETC, are entitled to offset the amounts owed by the Debtors in connection with the gathering, transport and sale of crude oil, natural gas, and natural gas liquids, and submit the net amount of revenue due to the Debtors pursuant to their applicable Marketing Arrangements.

65.      In instances where delivery of Marketed Production is refused, the Debtors may be forced to shut-in wells.  Not only does shutting in a well have immediate economic penalties due to the temporary cessation of production and revenue therefrom, but the process can also damage the Debtors' assets such that they may not be possible to reestablish production from a shut-in well in the future.  Further, the action of shutting in a well can trigger obligations to other interest owners in such well, if any, including payment obligations or potential forfeiture of the Debtors' interest under the terms of the applicable oil and natural gas lease.  Therefore, I believe it is critical that the Debtors pay prepetition Marketing Expenses and continue paying such Marketing Expenses in the ordinary course on a post-petition basis.

66.     In the twelve (12) months preceding the Petition Date, the Debtors paid approximately $92,493 in Marketing Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $7,226.93 of prepetition Marketing Expenses outstanding.

67.     In sum, I believe that payment by the Debtors, in their sole discretion, of each of the foregoing Lease Operating Expenses and Marketing Expenses is critical to protect the

Debtors' business operations during the pendency of the Chapter 11 Cases as the Debtors endeavor to complete a sale process. Even to the extent the amount of the such obligations owed to certain parties are *de minimis*, or alternative service providers may be available to provide services in Pecos County or Terrell County and the surrounding region, I believe that (i) changes in providers are not necessary or appropriate given a limited timeframe for the Debtors to complete the expedited sale process in these Chapter 11 Cases; and (ii) the harm and disruption that would occur far outweighs the amounts being paid. As a result, I believe payment of the Lease Operating Expenses and Marketing Expenses is in the best interests of the Debtors, their estates, creditors, and all parties in interest.

**H.    Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 1105, 361, 362, 363, 364 and 507, and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing Use of Cash Collateral; (II) Authorizing the Debtors to Obtain Secured Post-Petition Financing; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (the "<u>DIP Motion</u>")**

68.    The DIP Motion is critical to the Debtors' success in these Chapter 11 Cases, and without the Court granting the relief requested in the DIP Motion, each of the foregoing First Day Motions would be rendered moot. Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders approving the Debtors to obtain post-petition financing secured by liens and superpriority claims as working capital in the operation of their businesses for the purposes specified in, and at least for the period defined in, the budget (the "**Budget**") which is attached as Exhibit B to the DIP Motion.  Specifically, the Debtors request that the Court enter an order on an interim basis (the "**Interim Order**") authorizing the Debtors to obtain the DIP Financing and use Cash Collateral in accordance with the Budget, providing adequate protection for, and to the extent of, any diminution in value of the Cash Collateral, and scheduling a final hearing (the

"**Final Hearing**") for the Court to consider entry of a final order (the "**Final Order**") authorizing and approving the relief requested in the DIP Motion.

69.     Obtaining the requisite DIP Financing will ensure that the Debtors have access to sufficient liquidity to maintain ordinary course operations, meet their financial commitments, and complete the King of the Hill Well during these Chapter 11 Cases.  The Debtors require DIP Financing use of Cash Collateral to make payments to, *inter alia*, the Debtors' vendors, customers, Employees and Utility Companies (as defined above), for such purposes as to conduct oil and gas operations and pay related expenses.  Any failure to make those payments could cause substantial uncertainty and disruption to the Debtors' businesses.

70.     Based on the financial forecasts and analysis conducted by Debtors' management team and advisors, the Debtors are unable to generate enough cash from operations in the ordinary course of business to cover their working capital needs in addition to the projected costs of these Chapter 11 Cases.  Therefore, the Debtors will have insufficient cash absent authority to obtain DIP Financing. The use of such DIP Financing with the DIP Lender's consent will also send a positive, credible message to the Debtors' workforce and commercial counterparties that the Debtors will be able to meet their ordinary course obligations and operate in these Chapter 11 Cases as they move toward a successful sale of substantially all of their assets.

71.     The DIP Financing Agreement described in the DIP Motion was the product of extensive, arm's length negotiations with the proposed DIP Lender to secure an agreement regarding the Budget, the post-petition financing, and the terms of the Interim Order. Notwithstanding the fact that the proposed DIP Lender is an insider of the of the Debtors, the parties negotiated in good faith, and were each represented by separate counsel throughout the process. Moreover, neither the DIP Lender nor its controlling investor, Arcadius, will have input

26

on the Debtors operations during these Chapter 11 Cases.  As described above, the Board has authorized the establishment of a Special Committee to advise and assist me as the Authorized Representative of the Debtors in making decisions that are in the best interests of the estates and creditor constituency.  I believe the Debtors will face substantial and irreparable harm without the relief requested in the DIP Motion.  Accordingly, I believe the Court should grant the relief requested in the DIP Motion and enter the Interim Order, and after the conclusion of the Final Hearing, the Final Order, authorizing the Debtors to obtain and use the DIP Financing in accordance with the Budget.

Signed on this the 27th day of July, 2020.

By:  _____/s/ *Clay C. Border*_____
    Clay C. Border
    President and Chief Executive Officer
    Brahman Resource Partners, LLC, *et al*.